Docket No. 100443.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

VINCENT FISHER, Appellee, v. JILL WALDROP, Appellant.

*Opinion filed April 20, 2006.*

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Justices McMorrow, Fitzgerald, and Karmeier concurred in the judgment and opinion.

Chief Justice Thomas dissented, with opinion, joined by Justice Kilbride.

Justice Garman took no part in the decision.

## OPINION

This appeal involves amendments to the Illinois Parentage Act of 1984 (750 ILCS 45/1 *et seq.* (West 2002)) concerning removal of children from Illinois.

BACKGROUND

Vincent Fisher and Jill Waldrop[1] never married, but were involved in a relationship for several years. They had a child, Callie, who was born in February 1998. In August 2000 Fisher and Waldrop ended their relationship, and in May 2001 Fisher filed a petition to establish the parent/child relationship. Waldrop admitted that Fisher was Callie's father, and in December 2002 the circuit court of Sangamon County entered an order to that effect. The court awarded custody of Callie to Waldrop, but also set forth an extensive and detailed visitation schedule for Fisher. In its order, the court "decline[d] to impose geographic restrictions on Jill's choice of residence." In its order disposing of both parties' motions for reconsideration, the court specified that "[i]n the event [Waldrop] decides to move from her present residence, whether that move be intrastate or interstate, the issue of visitation between [Fisher] and Callie will be re-visited based upon the circumstances that exist at that time."

In December 2003, approximately a year after the order establishing paternity, Fisher filed a petition for temporary and permanent injunction pursuant to section 13.5 of the Parentage Act (750 ILCS 45/13.5 (West 2004)). In that petition Fisher alleged that Waldrop had notified him that she planned to move to Indiana with Callie and her new husband in 2004. Fisher asserted that Waldrop had not sought permission from the court to remove Callie from the state, as he contended she was required to do, and argued that to permit Waldrop to remove Callie from Illinois would cause irreparable harm to his relationship with Callie and would not be in Callie's best interests. Fisher asked the court to enjoin Waldrop from removing Callie from Illinois.

Shortly thereafter, Waldrop filed a petition pursuant to section 609 of the Illinois Marriage and Dissolution of Marriage Act (the Marriage Act) (750 ILCS 5/609 (West 2004)) for leave to remove Callie from Illinois. In the petition Waldrop noted that she had remarried and her new spouse had found employment in Indiana despite having been unable to do so in Illinois. Accordingly, she argued, it would be in Callie's best interests to permit Waldrop to remove her from Illinois. However, approximately a week after filing her petition for leave to remove, Waldrop moved to dismiss the petition. In the motion to dismiss, Waldrop noted that she and Fisher were never

---

[1] During the pendency of these proceedings Waldrop changed her last name to Kitzke, adopting the last name of the man she married in July 2003.

married, and asserted that "750 ILCS 45/13.5 governs petitions for removal in paternity cases, and it is the Petitioner's burden of proof to show that injunction is appropriate."

The court held a hearing on Fisher's petition in June 2004. At the outset of the hearing the court ruled that as a legal matter, the burden was on the person objecting to removal–in this case, Fisher–to establish that removal would not be in the child's best interests. The hearing lasted several days. Not only did Waldrop and Fisher both testify, they also introduced numerous exhibits and expert testimony regarding the effect on Callie of the proposed move.

Shortly after the conclusion of the hearing, the court rendered its decision in a lengthy written order. The court found that both Waldrop and Fisher were responsible for their acrimonious relationship with each other, but also found that "[b]ut for their relationship with one another, both [Fisher] and [Waldrop] are good, loving, effective parents." Relevant to our disposition of this case is the following portion of the court's order:

> "If the court were only to consider what is in the best interests of Callie Fisher, the court would conclude that it is not in the best interests of Callie that she be removed from the State of Illinois. The move from Springfield, Illinois to Richmond, Indiana will separate Callie from a parent with whom she has a close, loving relationship; she will be removed from the home in which she has been raised since shortly after her birth; her contact with her extended family, with whom she has a close relationship, will be substantially curtailed; she will move to a location where she has no extended family or friends; she will be subjected to a difficult commute in order to visit her father and other extended family members; she is moving to a community that does not have the resources that Springfield has; and strained communications between two parents (which the court attributes to each parent) will become almost impossible. The court also has substantial concern about how Callie will be cared for in Richmond when [Waldrop] is away from home for her craft shows which

are her livelihood. The court has substantial concerns about the nature of the relationship between Callie and [Waldrop's new husband]. By virtue of this Order Callie will have to go through a period of adjustment with a new step-parent in her home as well as a period of adjustment to a new community, in a new school, meeting new friends, all of which will have to be accomplished without her father or her extended family with whom she is very close and on whom she relies for emotional support. These problems were foreseeable when [Waldrop] elected to marry a man who had not lived in Illinois prior to the marriage and who planned to move the family to Georgia after marriage. It is a finding of this court that one of [Waldrop's] motives to marry and move away from Springfield was to separate herself from [Fisher]. The court also finds that [Fisher] is partly responsible for this result based upon his conduct towards [Waldrop].

*** 

The court concludes from the evidence that indirect benefits to Callie require the court to deny the Complaint for Injunctive Relief and thereby permit [Waldrop] to remove Callie to the State of Indiana. [Waldrop's new husband] was not able to find employment in Illinois. The job he has found in Indiana is a well paying job. [Waldrop] is pregnant, so that if the court allows the Injunction the unborn baby will be separated from his father, balanced against a granting of the injunction which will result in Callie being separated from [Fisher]. No matter what the court orders one child will lose contact with a parent. In this circumstance the benefit to [Waldrop] that indirectly benefits Callie is sufficient to warrant the denial of the Complaint for Injunctive Relief."

Fisher appealed. In proceedings before the appellate court, Waldrop's appellee brief was due on December 9, 2004. That date passed without Waldrop having filed a brief. Approximately two weeks later, on December 27, Waldrop's new counsel filed a motion requesting additional time to file

Waldrop's appellate brief. Although Fisher made no objection, the appellate court denied Waldrop leave to file a late brief. In its opinion disposing of the case, the appellate court noted that Waldrop had "failed to file a brief," but stated that "the claimed error is such that we can decide this appeal on the merits without the aid of [Waldrop's] appellee brief." 355 Ill. App. 3d 1130, 1137, citing *First Capitol Mortgage Corp. v. Talandis Construction Corp*, 63 Ill. 2d 128, 133 (1976).

The appellate court reversed and remanded, directing the circuit court to grant Fisher a permanent injunction. 355 Ill. App. 3d 1130. The court noted that the legislature had amended the Parentage Act in 2003 to deal with removal, and found that the amendments were intended to achieve two ends: to give never-married noncustodial parents a way to forestall removal while custody issues were pending; and to incorporate section 609 of the Marriage Act into the Parentage Act, "thereby requiring custodial parents to seek leave to remove a child from the state under the standards set forth in section 609." 335 Ill. App. 3d at 1139. The court held that the custodial parent had the burden of proving that removal was in the child's best interests in Parentage Act proceedings, just as they would in Marriage Act proceedings pursuant to section 609, and the circuit court erred by placing the burden of proof on Fisher, the noncustodial parent. The court further ruled that the circuit court's order denying the injunction was against the manifest weight of the evidence because the court had found that removal was not in Callie's best interests. 335 Ill. App. 3d at 1139-40. Finally, the appellate court held that the circuit court had erred in granting Waldrop permission to remove Callie from Illinois, because there was no petition for removal pending before the court.

Justice McCullough dissented. 335 Ill. App. 3d at 1142-43 (McCullough, J., dissenting). He agreed with the majority that section 609 of the Marriage Act controlled, but did not believe that the circuit court had evaluated Callie's best interests for purposes of making a section 609 determination. He would have remanded for the circuit court to perform such an evaluation rather than ordering the circuit court to grant a permanent injunction.

We granted Waldrop's petition for leave to appeal. See 155 Ill. 2d R. 315(a).

## ANALYSIS

Waldrop raises two arguments before this court. She argues first that the appellate court violated her due process rights when the court refused to allow her to file a late appellate brief. In the alternative, she argues that the appellate court's construction of the Parentage Act was faulty, specifically that the court erred in holding that a custodial parent must file a petition for removal before removing a child from the state and that the custodial parent has the burden of proving that removal would be in the best interests of the child.

We decline to address Waldrop's due process argument because it is moot. Whatever injury Waldrop may have suffered in being prevented from filing her brief with the appellate court was cured when this court granted her leave to appeal. Before this court Waldrop may raise any and all arguments that she could have presented to the appellate court, and we give the appellate court's decision no deference in resolving the issues before us. There is no other relief we could grant her even if we were to rule in her favor, which renders the issue moot. See *In re D.S.*, 217 Ill. 2d 306, 320 (2005) ("An issue is rendered moot when an intervening event makes it impossible for the court to grant effective relief to the complaining party"). Thus even if we were to agree that the appellate court erred in refusing to accept a late brief from a custodial parent in a case of first impression involving a minor child, the fact that Waldrop may now make any and all arguments she could have made in the appellate court would render any such error inconsequential. See *D.S.*, 217 Ill. 2d at 321.

Accordingly, we turn to the merits of the case. The question we must answer is what procedures must be followed in a case brought under the Parentage Act when a custodial parent seeks to remove a child from Illinois. Waldrop argues that in proceedings under the Parentage Act the custodial parent may remove a child from Illinois unless the noncustodial parent files

for and obtains an injunction pursuant to section 13.5. She argues that the burden is on the noncustodial parent to show that removal would not be in the child's best interests, and that the appellate court erred in holding otherwise. Fisher advocates for a different interpretation of the statutory scheme. He contends that custodial parents now must seek leave of court before removing a child from Illinois in actions brought under the Parentage Act just as they must in proceedings under the Marriage Act. He argues that section 13.5 is only intended to permit the noncustodial parent to enjoin removal until a custodial parent's petition for removal can be dealt with on the merits.

This dispute turns on statutory construction. The principles which guide our analysis are familiar. Our standard of review is *de novo*, and our primary objective is to give effect to the legislature's intent. The best indication of legislative intent is the statutory language, given its plain and ordinary meaning. Thus, when the statutory language is clear, it must be given effect without resort to other tools of interpretation, although we always presume that the legislature did not intend to create absurd, inconvenient or unjust results. *In re R.L.S.*, 218 Ill. 2d 428, 433 (2006).

Courts should consider a statute in its entirety, keeping in mind the subject it addresses and the legislature's apparent objective in enacting it and avoiding constructions which would render any term meaningless or superfluous. *Andrews v. Kowa Printing Corp.*, 217 Ill. 2d 101, 109 (2005); *Stroger v. Regional Transportation Authority*, 201 Ill. 2d 508, 524 (2002). Moreover, this court has a duty to construe a statute in a manner that upholds its validity and constitutionality if it reasonably can be done. *In re R.L.S.*, 218 Ill. 2d at 433.

Before 2003, the Parentage Act did not contain any provisions relating specifically to the issue of removal of children from Illinois. Although section 609 of the Marriage Act speaks directly to the situation,[2] our appellate court does not

---

[2]Section 609 provides that when a party with custody of a minor child seeks to remove the child from Illinois it is incumbent upon the party seeking removal to prove that removal is in the child's best interests. 750

import provisions of the Marriage Act into Parentage Act cases absent express statutory authority. See, *e.g.*, *In re Stella*, 339 Ill. App. 3d 610, 615 (2003) ("only those Marriage Act relevant factors and standards expressly embraced by the Parentage Act may be applied by trial judges in parentage cases"). Before 2003 no provision of the Parentage Act referenced or incorporated section 609 of the Marriage Act, and accordingly, the appellate court never applied the requirements of section 609 to the issue of removal in Parentage Act proceedings. See *In re Adams*, 324 Ill. App. 3d 177, 180 (2001) (circuit court has no inherent power to enjoin custodial parent from removing child from state in parentage actions); *In re Parentage of Melton*, 314 Ill. App. 3d 476, 478 (2000) (same); *In re Parentage of R.M.F.*, 275 Ill. App. 3d 43, 50 (1995) ("Because the Parentage Act contains no provisions requiring that actions for removal be resolved pursuant to section 609 of the Marriage Act, we find that section 609 of the Marriage Act is not implicitly incorporated into the Parentage Act").[3]

However, in 2003 the legislature amended the Parentage Act to address removal. Pub. Act 93–139, §5, eff. July 10, 2003. See 750 ILCS 45/13.5, 14, 16 (West 2004). Section 14 deals with initial judgments. After the 2003 amendments, it provides in relevant part as follows (additions emphasized):

> "The judgment shall contain or explicitly reserve provisions concerning any duty and amount of child support and may contain provisions concerning the custody and guardianship of the child, visitation privileges with the child, the furnishing of bond or other security for the payment of the judgment, which the court shall determine in accordance with the relevant factors set forth in the Illinois Marriage and Dissolution

ILCS 5/609(a) (West 2004).

[3]It is fair to note that although the appellate court did not read section 609 of the Marriage Act into Parentage Act proceedings prior to 2003, the court held that a best-interests hearing was nonetheless required before removal because of the effect that removal would have on the noncustodial parent's visitation. See, *e.g.*, *In re R.M.F.*, 275 Ill. App. 3d at 50-51.

of Marriage Act and any other applicable law of Illinois, to guide the court in a finding in the best interests of the child. In determining custody, joint custody, *removal,* or visitation, the court shall apply the relevant standards of the Illinois Marriage and Dissolution of Marriage Act, *including Section 609.*" (Emphases added.) 750 ILCS 45/14(a)(1) (West 2004).

Section 16 deals with modification of judgments, and underwent similar modifications:

"The court has continuing jurisdiction to modify an order for support, custody, visitation, *or removal* included in a judgment entered under this Act. Any custody, visitation, *or removal* judgment modification shall be in accordance with the relevant factors specified in the Illinois Marriage and Dissolution of Marriage Act, *including Section 609.*" (Emphases added.) 750 ILCS 45/16 (West 2004).

Finally, section 13.5 of the Parentage Act, added in 2003, provides in pertinent part:

"(a) In any action brought under this Act for the initial determination of custody or visitation of a child or for modification of a prior custody or visitation order, the court, upon application of any party, may enjoin a party having physical possession or custody of a child from temporarily or permanently removing the child from Illinois pending the adjudication of the issues of custody and visitation. When deciding whether to enjoin removal of a child, the Court shall consider the following factors including, but not limited to:

(1) the extent of previous involvement with the child by the party seeking to enjoin removal;

(2) the likelihood that parentage will be established; and

(3) the impact on the financial, physical, and emotional health of the party being enjoined from removing the child.

(b) Injunctive relief under this Act shall be governed by the relevant provisions of the Code of Civil Procedure." 750 ILCS 45/13.5 (West 2004).

As previously noted, Waldrop contends that section 13.5 is the operative section, and contends that unless a noncustodial parent files for an injunction pursuant to section 13.5, the Parentage Act does not restrict a custodial parent's ability to remove a child from the state. We disagree.

Sections 14 and 16 of the Parentage Act clearly refer to removal as an issue to be addressed in the initial judgment and in judgment modifications. See 750 ILCS 45/14, 16 (West 2004). Moreover, both sections specify that the court's determination on removal is to be made in accordance with section 609 of the Marriage Act. Section 609 specifies that the court "may grant leave" to a custodial parent to remove a child from Illinois–thus the parent must first request leave–and the burden is on the custodial parent to prove that removal would be in the child's best interests. 750 ILCS 5/609(a) (West 2004). See *In re Marriage of Roppo*, 225 Ill. App. 3d 721, 726 (1991) (under Marriage Act, "Court approval is required where minor children subject to the jurisdiction of the court are to be removed permanently from the State").

The language of section 13.5 does not support Waldrop's position. Section 13.5 permits the court to enjoin the custodial parent "from temporarily or permanently removing the child from Illinois *pending the adjudication of the issues of custody and visitation*." (Emphasis added.) 750 ILCS 45/13.5(a) (West 2004). It is clear that the injunctions permitted by section 13.5 are intended to be temporary in nature, keeping the child in Illinois only until the court can conduct a hearing on the merits of a removal petition.

Moreover, Waldrop's position would render the changes to sections 14 and 16 mere surplusage, which would violate one of our cardinal rules of statutory construction. See *Andrews*, 217 Ill. 2d at 109; *Stroger*, 201 Ill. 2d at 524. If, as Waldrop argues, a custodial parent can remove a child from Illinois unless the noncustodial parent files for an injunction pursuant to section 13.5, the changes the legislature made to sections 14 and 16 would be meaningless and utterly without effect. No

custodial parent would ever seek an order allowing removal if he or she automatically had the power to remove the child simply by virtue of being the custodial parent, as Waldrop argues.

Additionally, Fisher's suggested construction of the amendments to the Parentage Act has the virtue of greater similarity to the Marriage Act. Under the Marriage Act, as previously noted, a custodial parent must petition for leave of court before removing a child from Illinois, and the burden is on the custodial parent to show removal is in the child's best interests. 750 ILCS 5/609 (West 2004). However, the Marriage Act also provides that in all proceedings thereunder, any party may request a preliminary injunction to, *inter alia*, "enjoin[ ] a party from removing a child from the jurisdiction of the court." 750 ILCS 5/501(a)(2)(ii) (West 2004). The legislative history indicates that the legislature's intent was to grant a parent in a Parentage Act action rights similar, if not identical, to those of a parent in a Marriage Act action. See 93d Ill. Gen. Assem, House Proceedings, May 27, 2003, at 70 (statements of Representative Black) ("At least it gives the noncustodial parent a, I won't say the same right, but a similar standing to go to court and question the removal of the child or children, as the case may be, to another state if there's no apparent reason for the move").

For all these reasons, we conclude that Fisher's reading of the Parentage Act is correct. That is, when a custodial parent intends to remove a child from Illinois he or she must request leave of court, and the burden is on the custodial parent to show that removal would be in the child's best interests. It is not incumbent on a noncustodial parent to request an injunction pursuant to section 13.5 in order to force the custodial parent to request leave of court before removing children from the state regardless of whether an injunction has been sought, and a custodial parent who removes children from the state without having first at least requested leave could potentially be subjected to contempt proceedings. If the noncustodial parent does seek an injunction, the burden is on the noncustodial parent to establish that he has no adequate remedy at law and will suffer irreparable harm without

injunctive relief (see *Sadat v. American Motors Corp.*, 104 Ill. 2d 105, 115 (1984)), paying specific but not exclusive attention to the factors listed in section 13.5 of the Parentage Act (750 ILCS 45/13.5(a) (West 2004)).

Waldrop objects that this reading of the Parentage Act leads to the preposterous result of requiring two separate hearings with two different burdens of proof on essentially the same issue. Waldrop notes that injunctions under section 13.5 are "governed by the relevant provisions of the Code of Civil Procedure" (750 ILCS 45/13.5(b) (West 2004)), and that traditionally the burden is on the party seeking an injunction. See *Sadat*, 104 Ill. 2d at 115. Thus at the hearing on the injunction, Waldrop contends, the burden is on the noncustodial parent to prove that removal is not in the child's best interests. It does not make sense, Waldrop argues, that the legislature would require that the parties and court then perform an abrupt about-face and engage in *another* hearing at which the same best-interests issue is litigated, this time with the burden on the custodial parent.

First, as we noted above, preliminary injunctions against removal and best-interest hearings on removal can both occur in Marriage Act proceedings. See 750 ILCS 5/501(a)(2)(ii), 609 (West 2004). Accordingly, we see no reason why the two could not coexist peacefully in the Parentage Act. More fundamentally, however, we disagree with Waldrop that the two hearings deal with precisely the same issue. It is clear that at the hearing on the removal the sole issue is the best interests of the child. See 750 ILCS 5/609(a) (West 2004). However, at the hearing on the injunction, the focus is more on the parents' interests. Although other factors may be considered, the three factors which section 13.5 specifically requires the circuit court to take into account all involve the parents: the extent to which the party opposing removal has previously been involved with the child; the likelihood that parentage will be established; and the impact that an injunction would have on the custodial parent. See 750 ILCS 45/13.5(a)(1) through (a)(3) (West 2004). This makes sense, because at the injunction stage the noncustodial parent is not seeking to permanently prevent removal. Rather, the noncustodial parent is asserting that his

˘12˘

or her interest in and relationship with the child outweighs any burden that an injunction may impose on the custodial parent and, consequently, the status quo should be maintained until the custodial parent shows that the move is truly in the child's best interests.

Of course the circuit court should not turn a wholly blind eye to the child at the hearing on the injunction. The best interests of the child are always paramount in removal actions. *In re Marriage of Collingbourne*, 204 Ill. 2d 498, 521 (2003), citing *In re Marriage of Eckert*, 119 Ill. 2d 316, 325 (1988). However, at the hearing on the injunction section 13.5 of the Parentage Act clearly places the focus on whether the noncustodial parent has an interest of sufficient magnitude to warrant delaying removal until the custodial parent can prove that removal is in the child's best interests. Rather than dragging out the proceedings by turning the hearing on the injunction into a full-blown best-interests hearing, we believe that the legislature determined that at this stage the child's interests will be better served by focusing on the parents' interests, so that the injunction issue may be resolved quickly. This is important to clarify: the injunction hearing is not the equivalent of the best-interests hearing, and a circuit court's order denying an injunction is not tantamount to an order granting leave to remove. It is not impossible that a circuit court could conclude that a noncustodial parent was not entitled to an injunction but also ultimately determine that the custodial parent's proposed removal of the child would not be in the child's best interests.

In this case, Fisher filed a motion for injunction pursuant to section 13.5 of the Parentage Act and Waldrop never sought leave to remove. But in ruling on Fisher's injunction the court focused almost exclusively on the child's best interests. The court essentially proceeded as if Waldrop had filed for leave to remove, but with the critical difference of placing the burden on Fisher of proving that removal would *not* be in Callie's best interests. Moreover, the circuit court's conclusion was confusing–the court clearly stated that removal would not be in Callie's best interests, but then ruled that removal would be allowed because of the indirect benefit Callie would receive if Waldrop were permitted to move. Although benefit to the

custodial parent and the child's household are entirely proper matters to consider, they are factors in the circuit court's determination of what is in a child's best interests, not separate factors that overrule what would otherwise be in a child's best interest. See *In re Marriage of Collingbourne*, 204 Ill. 2d 498.

Not only is the circuit court's ultimate determination regarding whether the move would be in Callie's best interests somewhat ambiguous, the circuit court's findings do not provide a clear-cut answer as to whether the court would have granted Fisher an injunction if the court had focused on that issue. One of the listed factors is clearly satisfied, as paternity has already been admitted and established. See 750 ILCS 45/13.5(a)(2) (West 2004). The circuit court found Fisher to have had significant previous involvement and a strong relationship with Callie, indicating that another factor also would weigh in favor of the injunction. See 750 ILCS 45/13.5(a)(1) (West 2004). On the other hand, the court was clearly concerned about the effect on Waldrop's financial and emotional health were she to be enjoined from removing Callie. Whether an injunction would be proper is not sufficiently evident as to permit this court to enter an order based on the cold record before us.

We note as well that, even if it were clear that Fisher was entitled to an injunction, the appellate court would have erred in ordering that the circuit court make the injunction permanent. Although the appellate court did not explain its reasoning, it may be that the court focused on that portion of section 13.5 which states that the court "may enjoin a party having physical possession or custody of a child from temporarily or permanently removing the child" from Illinois. See 750 ILCS 45/13.5 (West 2004). However, it is clear that the phrase "temporarily or permanently" modifies the verb "removing," rather than the verb "may enjoin." In other words, the court has the power to enjoin removal, whether the removal is intended to be permanent or only temporary. But this is not the same thing as saying that the court has the power to temporarily or permanently enjoin the custodial parent from removing the child. It is clear that section 13.5 does not contemplate a permanent injunction, given that it only permits the circuit court

to enjoin removal "pending the adjudication of the issues of custody and visitation."[4] Even if it were clear that Fisher was entitled to an injunction, neither he nor any parent may be granted an injunction of a permanent nature.

We believe that the only appropriate course of action is to remand for the circuit court to rule on Fisher's injunction, focusing as we have stated on whether the factors listed in section 13.5, as well as any other similar matters the circuit finds relevant, warrant enjoining Waldrop from removing Callie until a best interests hearing on Callie's removal has been held. Regardless of the outcome of this hearing, Waldrop must file a petition for leave to remove Callie from Illinois if she still intends to do so.[5]

---

[4]It appears that the appellate court may itself have had some doubt regarding the propriety of a permanent injunction, in light of the court's explicit comment that Waldrop could file a petition for leave to remove on remand. See 335 Ill. App. 3d at 1142. If the court truly meant what it said when it ordered the circuit court to enter a permanent injunction, it is not clear what good it would have done Waldrop to file such a petition.

[5]It is true that in its initial rulings on parentage and custody the court refused to bar Waldrop from removing Callie. However, we do not read the court's orders as granting Waldrop blanket authority to remove Callie from Illinois at any time in the future for any reason regardless of the

CONCLUSION

The appellate court was correct to reverse the circuit court's judgment granting Waldrop leave to remove Callie from Illinois, and was also correct that the Parentage Act requires the custodial parent to seek leave of court for removal and to prove that removal would be in the child's best interests. However, we do not agree with the appellate court that the circuit court's denial of injunction was against the manifest weight of the evidence, and thus ought to be reversed outright. Rather, because it appears that the circuit court conflated the issues of injunction and removal, the proper course is to remand for the circuit court to rule on the injunction request. Moreover, even if the circuit court's denial of injunction had been against the manifest weight of the evidence, the appellate court would have erred in ordering the circuit court to issue a permanent injunction on remand, a remedy which the statute does not contemplate.

Accordingly, the judgment of the appellate court is affirmed in part and reversed in part, the judgment of the circuit court is reversed, and the cause is remanded to the circuit court to rule on Fisher's motion for injunction in accordance with the guidelines set out above.

*Appellate court judgment affirmed in part*
*and reversed in part;*
*circuit court judgment reversed;*

---

circumstances. Rather, the court was merely rejecting Fisher's demand that the court issue a blanket prospective ban on removal, which was entirely proper–a custodial parent's interest are not automatically subordinate to those of the noncustodial parent. *In re Marriage of Collingbourne*, 204 Ill. 2d at 528.

*cause remanded.*

JUSTICE GARMAN took no part in the consideration or decision of this case.

CHIEF JUSTICE THOMAS, dissenting:

I do not agree with the majority's construction of the applicable statutes or with its conclusion that this case must be remanded for another hearing on Fisher's motion for an injunction. In my view, section 13.5 has no application to this case, and therefore the cause should not be remanded for a hearing to determine whether Fisher has the right to an injunction under that section.

This case has worked its way through the circuit court, the appellate court, and the supreme court, without anyone questioning Fisher's right to file for an injunction under section 13.5. This is curious, as the first sentence of that section provides that:

> "In *any action brought under this Act* for the initial determination of *custody or visitation* of a child or for modification of a prior *custody or visitation order*, the court, upon application of any party, may enjoin a party having physical possession or custody of a child from temporarily or permanently removing the child from Illinois *pending the adjudication of the issues of custody and visitation.*" (Emphases added.) 750 ILCS 45/13.5(a) (West 2004).

Thus, before a party may move for an injunction under section 13.5, there must be (1) an action brought under the Parentage Act, and (2) that action must be one for the initial determination of custody or visitation, or for modification of a prior custody or visitation order. Here, there was no pending action for modification of custody or visitation when Fisher moved for an injunction. Rather, Fisher *initiated* this proceeding by moving for an injunction. There was briefly a *removal* action filed by Waldrop, and this removal petition included a request that Fisher's visitation schedule be "adjusted accordingly," but Waldrop voluntarily dismissed this action after one week. Thus,

at the time Fisher moved for the injunction there was not, nor is there now, a pending action for custody or visitation. Why would we remand this cause for a hearing to determine whether Fisher is entitled to an injunction preventing Callie's removal from Illinois pending the determination of custody or visitation issues, when there are no pending custody or visitation issues?

Although the error is not ultimately relevant on the facts of this case, the majority gets itself on the wrong track by improperly reading the word "removal" into section 13.5. The majority quotes from section 13.5 and even emphasizes the language "pending the adjudication of the issues of custody and visitation." See slip op. at 10. In the very next sentence, however, the majority asserts that "[i]t is clear that the injunctions permitted by section 13.5 are intended to be temporary in nature, keeping the child in Illinois only until the court can conduct a hearing on the merits of a removal petition." Slip op. at 10. The majority never explains how it made the leap from "issues of custody and visitation" to "removal petition." Perhaps the majority is assuming that a petition for removal is necessarily a petition to modify visitation. This is not necessarily the case, however, and whether a removal results in a modification of visitation depends on the circumstances of the particular case. Moreover, as the majority is well aware, the Parentage Act treats "removal" as a separate issue from custody and visitation. See, *e.g.*, 750 ILCS 45/14(a)(1) (West 2004) ("In determining custody, joint custody, removal, or visitation, the court shall apply the relevant standards of the Illinois Marriage and Dissolution of Marriage Act, including Section 609"); 750 ILCS 45/16 (West 2004) ("The court has continuing jurisdiction to modify an order for support, custody, visitation, or removal included in a judgment entered under this Act"). Thus, contrary to the majority's interpretation, section 13.5 is not automatically triggered when the action the court is considering is a removal petition filed by the custodial parent. Here, however, the removal petition included a request that the court modify visitation accordingly. Thus, if the majority is going to conclude that section 13.5 is relevant to this case, it should do so solely

on the basis that Waldrop moved to modify the visitation schedule, not because she filed a removal petition. It should then conclude both that Waldrop's withdrawal of that request renders section 13.5 inapplicable and that a remand for a hearing on Fisher's request for an injunction is unnecessary.

Moreover, even if the majority were correct that the word "removal" should be judicially legislated into section 13.5, a remand would still be unnecessary. According to the majority, "the injunctions permitted by section 13.5 are intended to be temporary in nature, keeping the child in Illinois only until the court can conduct a hearing on the merits of a removal petition." Slip op. at 10. Yet the majority readily concedes that there is no removal petition pending in the circuit court. Slip op. at 2, 13, 14. The majority leaves it to the reader to ponder why this cause is being remanded to the circuit court to determine if it will enjoin removal pending the adjudication of the merits of a removal petition when there is no removal petition.

In my view, the majority is unnecessarily creating tension between the various sections of the Parentage Act dealing with removal. I believe that the legislature intended section 13.5 to be used *before* a judgment of parentage has been entered. Once the court has entered a parentage judgment, section 609 of the Marriage Act is triggered and a noncustodial parent no longer needs to rely on section 13.5. 750 ILCS 45/14(a)(1), 16 (West 2004); see also A. Albrecht, *2003 Spring Session Roundup: Family Law*, 91 Ill. B.J. 381 (2003) ("House Bill 1382 (Fritchey, D-Chicago; Garrett, D-Lake Forest) allows a party to a Parentage Act case to obtain an injunction prohibiting the permanent removal of the child from Illinois. There is no requirement that parentage be established before the petition for injunction is filed. Once there is an order of parentage, the criteria of section 609 of the Illinois Marriage and Dissolution of Marriage Act apply"). Section 609 requires a custodial parent to obtain leave of court before temporarily or permanently removing the child from the state. Thus, section 609 already restrains the parent from removing the child from the state, and an injunction would be wholly redundant. This interpretation is supported by the plain language of section 13.5 and by its chronological placement in the Parentage Act. The legislature

˘19˘

placed this section directly after section 13.1 (750 ILCS 5/13.1 (West 2004)), which deals with temporary support orders pending a judicial determination of parentage, and before section 14, which addresses parentage judgments. Moreover, one of the factors the legislature directs the court to consider in determining whether to grant a section 13.5 injunction is "the likelihood that parentage will be established." 750 ILCS 45/13.5(a)(2) (West 2004). This factor makes little sense if the legislature intended this section to apply after a parentage judgment has been entered. When section 13.5 is viewed in this light, it makes sense that the legislature made section 13.5 applicable only in custody and visitation actions and not in removal actions: once section 609 is triggered and a removal petition is required, section 13.5 is irrelevant. Here, because the court had already entered a parentage judgment, Waldrop was required to demonstrate that removal was in Callie's best interests and to obtain leave of court before temporarily or permanently removing her from Illinois.

Contrast this to the majority's interpretation. The majority believes that the legislature intended to establish a bifurcated proceeding for postjudgment removal actions. Under this procedure, although the custodial parent must obtain leave of court before removing the child, the noncustodial parent may also move for an injunction to prevent removal. If the noncustodial parent does so, the court will then hold two hearings, the first focusing on the parents' interests and the second focusing on the best interests of the child. Apparently, the purpose of this first hearing is for the court to determine if it will allow the custodial parent to improperly leave the state in defiance of the statute. At the second hearing, the court will focus on the best interests of the child and determine if the custodial parent will be allowed to remove the child lawfully.

The majority is able to reach this strange conclusion only by rewriting section 609 of the Marriage Act. Section 609, which is fully applicable in Parentage Act cases once a parentage judgment has been entered, requires a party to obtain leave of court before removing the child. The majority holds, however, that a custodial parent is free to remove the child simply by *filing* a removal petition, and, as long as the parent does so, he

or she will not be subject to contempt proceedings. Slip op. at 11 ("the custodial parent [must] *request* leave of court before removing children from the state regardless of whether an injunction has been sought, and a custodial parent who removes children from the state without having first *at least requested* leave could potentially be subject to contempt proceedings" (emphases added)). The majority apparently feels cornered into this interpretation, because a straightforward application of section 609 shows why a bifurcated hearing makes no sense. If the custodial parent may not remove the child without obtaining leave of court, then the injunction hearing is without any effect. If the injunction is denied, the custodial parent may not leave; if the injunction is granted, the custodial parent may not leave. See slip op. at 14 ("[r]egardless of the outcome of this hearing, Waldrop must file a petition for leave to remove Callie from Illinois if she still intends to do so"). Thus, the majority is forced to come up with its "free to leave once leave is requested" theory in order to make section 13.5 relevant in postjudgment removal actions.

If this is bad statutory construction, it is even worse policy. Under the majority's bifurcated hearing system in which a parent is free to remove the child once leave is requested, and the court will only consider the parents' interests in deciding whether to enjoin this first removal, it is possible that the court could reach two different conclusions. It could allow the initial removal, based on an evaluation of the parents' interests, but then deny removal once it considers the child's best interests. See slip op. at 12 ("[i]t is not impossible that a circuit court could conclude that a noncustodial parent was not entitled to an injunction but also ultimately determine that the custodial parent's proposed removal of the child would not be in the child's best interests"). The child will then have his or her life disrupted twice, and the custodial parent could be forced to give up his or her new life and move back to a previous home. Because a court will be loathe to do this, the result of the majority's bifurcated hearing system inevitably will be a prejudicing of the rights of noncustodial parents. If the child is removed from the state pending the best-interests hearing, the child will have begun a new life in a new home, and his or her

best interests likely will have changed. It will be impossible for a court to turn a blind eye to the child's changed environment. See, *e.g.*, *Reddig v. Reddig*, 12 Ill. App. 3d 1009, 1011 (1973) (court remands for new best-interests hearing for children who had been improperly removed to Texas in violation of a court order; appellate court determines that trial court must take into account the fact that children had been living in Texas for over six months).

Although it is not always possible for a court to know what is in a child's best interests, I think we can say for certain what is not: multiple removal hearings with shifting burdens of proof. Callie has already been subjected to one removal hearing, and under the majority's erroneous interpretation of the Parentage Act, she will now be subjected to two more, with different burdens of proof. The majority brushes these concerns aside with the assertion that a similar procedure is provided for in the Marriage Act. Slip op. at 11. This is not correct. The Marriage Act injunction provision is one sentence that states that a party may request a preliminary injunction to enjoin a party "from removing a child from the jurisdiction of the court." 750 ILCS 5/501(a)(2)(ii) (West 2004). This section reads nothing like section 13.5 of the Parentage Act and does not list factors for the court to consider in determining whether to issue such an injunction. The majority fails to cite a single case supporting its theory that there is a bifurcated system under the Marriage Act in which there are two removal hearings, one focusing on the parents and another focusing on the child. I fear that the result of today's decision will be that the bifurcated removal hearing necessarily will be read into the Marriage Act, and that future courts will see a tension between sections 501(a)(2)(ii) and 609 where none was evident before. Moreover, it is inevitable that parents seeking to remove children under the Marriage Act will rely on today's opinion as authority for the proposition that they are entitled to remove them simply by requesting leave to remove.

Finally, even if the majority's construction of the Parentage Act is correct and section 13.5 is applicable to this case, it would still not be necessary to remand for a new injunction hearing. The majority fears ruling on the request for an

injunction on the basis of a "cold record." Slip op. at 13. Yet it concedes that two out of the three statutory factors clearly weigh in favor of Fisher. Moreover, section 13.5 allows the court to consider any other factor. Surely significant factors weighing in favor of Fisher are that Waldrop has no right to remove Callie from the state and, indeed, is not even currently seeking to do so, as she has withdrawn her petition. Thus, even if the majority persists in its erroneous view that section 13.5 applies after a parentage judgment has been entered and in the absence of pending custody and visitation issues, it should conclude that Fisher is entitled to an injunction rather than remanding this cause for another hearing.

In sum, there is simply no reason to remand this cause for another hearing on Fisher's request for an injunction. That request is moot because (1) a parentage judgment has already been entered, thus triggering the protections of section 609 of the Marriage Act; and (2) there are no custody or visitation issues currently pending before the circuit court. The majority's misreading of the applicable statutes has led it to adopt a disruptive procedure that is no one's best interests, least of all the children involved in removal cases, whose best interests are supposed to be paramount. I cannot join such an opinion, and therefore must dissent.

JUSTICE KILBRIDE joins in this dissent.